ELLIS GEORGE LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@ellisgeorge.com
John C. Harabedian (State Bar No. 275818)
  jharabedian@ellisgeorge.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

*Additional Counsel on Signature Page*

Attorneys for Plaintiff
DB Communications d/b/a Multiply

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DB COMMUNICATIONS LLC D/B/A MULTIPLY,<br><br>          Plaintiff,<br><br>   vs.<br><br>X CORP.,<br><br>          Defendant. | Case No. 3:24-CV-04402<br><br>**COMPLAINT FOR:**<br>**1. TRADEMARK INFRINGEMENT [15 U.S.C. § 1114];**<br>**2. FALSE DESIGNATION OF ORIGIN [15 U.S.C. § 1125(A)];**<br>**3. COMMON LAW UNFAIR COMPETITION;**<br>**4. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW [BUS. & PROF. CODE § § 17200, ET SEQ.]**<br><br>**DEMAND FOR JURY TRIAL** |

2440055

1    Plaintiff DB Communications LLC d/b/a Multiply ("Plaintiff" or "Multiply"),
2 as and for its complaint against defendant X Corp. ("Defendant" or "X (formerly
3 Twitter)"), alleges as follows:

4                                    **PARTIES**

5    1.    Plaintiff is a Virginia LLC with its principal place of business in
6 Albemarle County, Virginia.  Plaintiff is the owner of the registered trademark at
7 issue herein.

8    2.    Plaintiff is informed and believes, and thereon alleges, that Defendant
9 is a Nevada corporation with its principal place of business in San Francisco,
10 California.

11                          **JURISDICTION AND VENUE**

12    3.    This Court has subject matter jurisdiction over this action pursuant to
13 28 U.S.C. §§ 1331 and 1338 because the action arises under the federal Lanham
14 Act.  *See* 17 U.S.C. §§ 101, *et seq.*; 15 U.S.C. §§ 1051, *et seq*.  This Court also has
15 supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

16    4.    Venue in this district is proper under 28 U.S.C. § 1391 because
17 Defendant maintains its principal place of business in this judicial district.

18    5.    This Court has personal jurisdiction over Defendant because Defendant
19 maintains its principal place of business in California, and specifically within this
20 judicial district.

21                          **GENERAL ALLEGATIONS**

22    **A.    Multiply Directly Competes with X (Formerly Twitter)**

23    6.    Daniel Baum ("Baum") founded Multiply in February 2000 as DB
24 Communications LLC and, in October 2015, renamed it DB Communications LLC
25 d/b/a Multiply.

26    7.    Multiply is a social media and public relations agency that creates and
27 maintains social media advertising campaigns for various brands, ranging from the
28 largest and most well-known brands globally, such as major breweries, wineries,

and soda manufacturers, to emerging and niche brands who retain Multiply to help raise their profile.

8.    Since 2019, Multiply has operated under a stylized "X" trademark registered with the United States Patent and Trademark Office (the "X Mark"). Below is a picture of the X Mark.



9.    As alleged in greater detail below, Multiply uses its registered X Mark to identify itself in its new business pitches, marketing and promotional materials, communications, contracts, email signatures, client deliverables, social media accounts, and office spaces, among other brand identifying materials used to retain and maintain its clients.

10.    Multiply employees refer to Multiply as "X" and refer to Multiply employees and prospective employees as "Xers."

11.    As a social media and public relations agency, Multiply creates marketing campaigns primarily for clients seeking to promote their brand on X (formerly Twitter), Facebook, Instagram, and TikTok.

12.    Multiply broadly advertises and markets its services to prospective and existing clients at trade shows, during sales presentations, in internet marketing, on LinkedIn, via email marketing, and in responses to "Requests for Proposals."

13.    To retain prospective clients and maintain existing clients, Multiply routinely creates advertising pitches tailored to the social media advertising and marketing needs of the client, sometimes responding to Requests for Proposals issued by the prospective or existing client seeking to launch a social media

1   campaign.

2   14.    Multiply also invested significantly in its proprietary analytics

3   software, known as the X Dashboard, to offer prospective and existing clients

4   sophisticated data integration tools to track their social media advertising and

5   marketing campaigns, such as click throughs and web hits, social trends,

6   engagement rates, revenue trends, impressions and reach, and other campaign-

7   specific results.

8   15.    The X Dashboard uses the X Mark as its identifying feature.

9   16.    When creating marketing pitches and selling its X Dashboard to

10   prospective and existing clients, Multiply competes directly with the social media

11   platforms themselves.

12   17.    Social media platforms, including X (formerly Twitter), act as more

13   than just a platform for users to view content.  These social media platforms,

14   including X (formerly Twitter), also engage in the same social media marketing and

15   advertising business as Multiply, offering prospective clients the same or similar

16   marketing services as Multiply.  Those services include, among others, the use of in-

17   house creative teams to develop social media campaigns for their clients and data

18   integration tools that offer their clients analytics like Multiply's X Dashboard.

19   18.    Social media platforms, including X (formerly Twitter), routinely

20   respond to the same clients seeking marketing and social media services, directly

21   competing with Multiply for those prospective and existing clients' marketing

22   budgets.

23   19.    X (formerly Twitter) has its own in-house creative team dedicated to

24   creating social media advertising campaigns and brand strategies for prospective and

25   existing clients, the ***same services*** that Multiply offers its prospective and existing

26   clients.

27   20.    X (formerly Twitter) has its own analytics software offering customers

28   data integration tools to track the performance of social media campaigns, the ***same***

2440055

*services* that Multiply's X Dashboard offers its prospective and existing clients.

21.    Multiply and X (formerly Twitter) compete for the exact *same clients*.

22.    Representatives of Multiply and X (formerly Twitter) routinely attend the same trade shows and events seeking to retain the same prospective clients, directly competing for the most dollars out of those clients' marketing budgets.

23.    For example, Multiply and X (formerly Twitter) have both participated in an exclusive annual event known as the Beer Wine & Spirits Summit, which hosts the top leaders and executives in the U.S. beverage alcohol industry, including brewers, importers, wineries, wholesalers, and retailers.  The Summit is known as the place "where deals get done" in this "tight-knit industry."[1]  Attendance at the Summit is capped at a few hundred to "facilitate effective networking."  Both Multiply and X (formerly Twitter) attend this annual event to develop relationships and market their services to the same prospective clients, directly competing with each other.

24.    Similarly, Multiply and X (formerly Twitter) both aim to secure press coverage in the same media outlets, such as Ad Age, Mediaweek, PR Week, and Campaign US.

25.    In directly competing with X (formerly Twitter) for the same prospective clients, Multiply identifies itself in all its communications, business cards, emails signatures, and promotional materials with the X Mark.

**B.    Multiply's Trademark Registration for the X Mark**

26.    In October 2016, Baum and Multiply decided to create a unique logo to identify Multiply in its advertising pitches, marketing and promotional materials, communications, contracts, email signatures, client deliverables, social media accounts, and office spaces, among other brand identifying materials.

---

[1] https://beernet.com/beer-summit/

27.     Baum and Multiply worked with designers and intellectual property attorneys and invested time, resources, and money into developing a unique logo that clients and prospective clients would readily associate with, and identify as, Multiply.

28.     Baum created a stylized "X" that is not only visibly appealing, but also implicitly associated with a multiplication symbol, ensuring prospective and existing clients would generally associate the style and meaning of the logo "X" with Multiply, a premier social media marketing agency.

29.     On March 9, 2018, Baum filed an Intent to Use application with the United States Patent and Trademark Office ("USPTO"), seeking trademark protection for the following unique, stylized symbol "X" (*i.e.*, the X Mark):



30.     Thereafter, Baum authorized Multiply to use the X Mark in all its marketing and promotional materials, communications, contracts, client deliverables, office space, social media accounts, promotional merchandise, and other brand identifying materials, including the X Dashboard.

31.     On June 21, 2018, the examining attorney at the USPTO concluded that there were no similar registered or prior pending marks that would bar registration of the X Mark.

32.     On October 16, 2018, the USPTO published the X Mark in the Trademark Official Gazette to allow any person monitoring the Gazette for potential "X" trademarks an opportunity to appear and object for any reason, such as a prior or intended use of a similar stylized symbol "X".

33.     The USPTO received no objections to the X Mark.

34.     On January 21, 2020, the USPTO granted Baum registration of the X Mark on the Principal Register, Registration No. 5968076, with a filing date of March 9, 2018.

35.     The X Mark applies to Class 35 (Advertising and business) and is identified as:

> Advertising agency services; advertising and marketing services, namely, search engine and *social media* marketing, internet marketing, mobile marketing, blogging and other forms of passive, sharable or viral communications; providing marketing consulting in the field of *social media*; on-line customer-based *social media* brand marketing services; *social media* strategy and marketing consultancy relating to creating and extending product and brand strategies through building virally engaging marketing solutions; advertising and publicity services, namely, promoting the products, services, brand identity and commercial information and news of third parties through print, audio, video, digital and on-line medium. (emphasis added).

36.     The X Mark is the *only* registered trademark of a stylized letter X that is used in a manner that competes with X (formerly Twitter) in the social media advertising industry.

**C.     Multiply's Use of the X Mark**

37.     Multiply has consistently used the X Mark prominently in all its marketing and promotional materials, communications, contracts, sales presentations, client deliverables, social media accounts, office spaces, and similar personally identifiable materials since late 2019.

38.     On March 12, 2024, Baum formally assigned the X Mark, including any and all causes of action relating to the X Mark, to Multiply.

39.     Multiply's pitches to prospective and existing clients feature the X Mark prominently to help prospective and existing clients identify the X Mark with

Multiply and strengthen the association between Multiply and the X Mark.

40.     Multiply pitches its various social media marketing services by associating each of those services with the X Mark.  For example:



41.     Multiply routinely uses its X Mark as a watermark on the pages of its marketing and promotional materials sent to prospective and existing clients.

42.     In its marketing and promotional materials, Multiply identifies X (formerly Twitter) as one of the social media platforms on which Multiply develops marketing campaigns for its prospective and existing clients.

43.     Multiply proposes tailored marketing campaigns designed for X (formerly Twitter) and highlights the success of prior marketing campaigns it designed and developed for X (formerly Twitter).

44.     Multiply also incorporates the X Mark as part of its X Dashboard, Multiply's analytics tool that allows customers to track the performance of Multiply's social media content and advertising campaigns.

45.     Multiply concludes nearly every pitch to prospective and existing clients with the X Mark prominently displayed across the entire screen:



46. For years, including through the present, the homepage for Multiply's website features a rotating version of the X Mark that occupies the entire screen:



47. For nearly five years, Multiply has been developing its identity as "X" by using the X Mark in every advertising pitch, every promotional material, every contract, even every email.

1     48.    In short, Multiply is X.  Or at least it was.

2    **D.**    **Twitter Rebrands as an Infringing "X"**

3     49.    Prior to July 2023, hundreds of millions, if not billions, of people
4 recognized "Twitter" as the brand name of a social media platform.  Hundreds of
5 millions of people actively used Twitter on a daily basis, helping generate billions of
6 dollars in annual revenue.

7     50.    In October 2022, Elon Musk acquired Twitter.

8     51.    In late July 2023, Twitter rebranded to "X" and changed its name to X
9 Corporation.

10     52.    On information and belief, it was Musk who decided to rebrand Twitter
11 as "X."

12     53.    After the USPTO published Multiply's application for trademark
13 protection for the X Mark in the Trademark Official Gazette in 2018, neither Musk
14 nor X (formerly Twitter) objected during the objection period or at any time
15 thereafter.

16     54.    Neither Musk nor X (formerly Twitter) contacted Multiply or Baum at
17 any time to seek consent to use the X Mark or a substantially similar mark.

18     55.    Neither Musk nor X (formerly Twitter) contacted Multiply or Baum at
19 any time to offer or negotiate a reasonable royalty for a license to use the X Mark or
20 a substantially similar mark.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

56.     It was not until late 2023 that X (formerly Twitter) filed applications with the USPTO seeking trademark protection for its new logo, a stylized "X" substantially similar to the X Mark:



**X (formerly Twitter)'s Infringing Mark**                    **Multiply's X Mark**

57.     The logo used by X (formerly Twitter) (the "Infringing Mark") is substantially similar to the X Mark and used in the identical industry as the X Mark. Both marks use parallel lines creating a type of rectangular parallelogram known as a rhomboid.

58.     A rhomboid is a unique shape characterized by equal and parallel opposite sides, equal opposite angles, and diagonals that do not bisect at right angles.

59.     In seeking to register its "X" logo as its own mark, it would have been common practice for X (formerly Twitter) to conduct due diligence, including a search for related marks and an evaluation of its likelihood of obtaining a registration on its mark.

60.     Upon conducting such due diligence, X (formerly Twitter) would have identified the X Mark during this search, which suggests that the decision to use its Infringing Mark despite Multiply's trademark protection for a substantially similar "X" was knowing and intentional.

61.     In December 2023, X (formerly Twitter) filed an application to register its Infringing Mark in the same class as the X Mark (Class 35) and for the same purposes as the X Mark, including "business data analysis" and "promotional

services," among other infringing uses.

62.    Even if X (formerly Twitter) did not identify the X Mark at the time it sought to register its infringing "X" logo, it has since identified the X Mark and continues to use its Infringing Mark.

63.    In May 2024, Multiply notified X (formerly Twitter) that it was infringing on Multiply's X Mark and agreed with X (formerly Twitter) to a two-month standstill to negotiate a potential resolution.

64.    After agreeing to the standstill, Multiply followed up multiple times to attempt to negotiate a resolution but X (formerly Twitter) never responded and instead continued to willfully infringe with knowledge of Multiply's X Mark.

65.    X (formerly Twitter) also had constructive notice of Multiply's rights in its federally registered trademark under 15 U.S.C. § 1072, which states: "Registration of a mark on the principal register provided by this Act or under the Act of March 3, 1981, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof."

66.    There is no identifiable connection between X's former brand, Twitter, associated with a blue bird, and the symbol "X."

67.    Multiply sought and obtained trademark protection for its X Mark because it represents the multiplication symbol, associating the X Mark with company Multiply.

**E.     X (Formerly Twitter) Infringes on Multiply's Trademark and Encourages Others to Infringe**

68.    On its website, X (formerly Twitter) describes its Infringing Mark as its "most recognizable asset":



**X logo**

Our logo is our most recognizable asset. That's why we're so protective of it. Take a moment to think about how you apply it.

69.    X (formerly Twitter) offers the same social media advertising and marketing services as Multiply and the same social media analytics services offered by Multiply.

70.    Just as Multiply displays its X Mark, X (formerly Twitter) displays its Infringing Mark prominently before each of the services it offers to the same prospective and existing clients that Multiply competes for.  For example:



71.    Just as Multiply displays its X Mark, X (formerly Twitter) displays its Infringing Mark prominently on its marketing materials to prospective and existing clients, seeking the same advertising business and revenue that Multiply seeks from those clients.  For example:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10



11    72.    X (formerly Twitter) offers a "Brand toolkit," its "one-stop shop for X
12    assets," widely disseminating and flooding the market with its Infringing Mark for
13    its hundreds of millions of daily active users to download and use in their own
14    infringing manner:

15
16
17
18
19
20    
21
22
23
24

25    73.    Every social media marketing agency that competes with Multiply has
26    access to download and freely use the Infringing Mark in their own marketing and
27    promotional materials.

28

74. On information and belief, Multiply's competitors have downloaded and used the Infringing Mark in their marketing and promotional materials.

75. Multiply itself is now forced to use the Infringing Mark as part of its own marketing and promotional materials when it offers to create marketing campaigns. Whereas Multiply previously advertised its services in the manner of 𝕏 for 🐦, it now must advertise in the manner of 𝕏 for 𝕏, which is inherently confusing, prejudicial to Multiply, and damaging to its brand.

**F.     Confusion Occurs Among Multiply's Clients, Prospective Clients, and Colleagues**

76. Multiply's existing and prospective clients, as well as colleagues of Multiply's employees, expressed confusion following the rebrand of Twitter to X.

77. Numerous Multiply clients and prospective clients, ranging from the smallest emerging brands to the most sophisticated, began inquiring about the apparent similarity, if not identical nature, of the X Mark and the Infringing Mark and whether Multiply was now affiliated with X (formerly Twitter).

78. In the aftermath of Twitter's rebrand to the Infringing Mark, Multiply's routine meetings with existing clients to discuss the performance of their social media campaigns often shifted to damage control. Clients inquired about the similarities between the logos and Multiply acted quickly to quell client confusion over the apparent affiliation between the two companies.

79. For example, at a meeting in late Summer 2023 with one of Multiply's clients, the client's creative director brought up the apparent similarity between the X Mark and X (formerly Twitter)'s Infringing Mark. The Multiply marketing team attempted to brush it off, but also at the meeting was the client's Director of Brand and Communications, a senior position in the company, who followed up to ask, "Are you guys affiliated with them?"

80. The Director was genuinely confused and Multiply's team was compelled to explain that, no, Multiply was not affiliated with X (formerly Twitter)

1  but that, yes, X (formerly Twitter) rebranded itself as a nearly identical "X."

2      81.    This was an embarrassing concession that, despite Multiply's

3  trademark and entire identity as the X Mark, Multiply's competitor in the social

4  media marketing industry simply stepped in and subsumed Multiply's identity

5  without permission and with impunity.

6      82.    Moreover, Multiply was forced to make this uncomfortable concession

7  just as the client's 18-month contract with Multiply was set to expire and Multiply

8  was engaging the client to renew the contract.

9      83.    Shortly after the meeting, the client chose not to renew.

10      84.    Multiply's meetings with prospective clients during that time ran

11  similarly to its meetings with existing clients.  Before getting to the substance and

12  purpose of a meeting, prospective clients often raised questions about Twitter's

13  rebrand to the Infringing Mark.

14      85.    For example, Multiply had been pitching one prospective client for

15  over a year, meeting with them over 20 times during that time period.  At around the

16  20th meeting, shortly after X (formerly Twitter) rebranded to the Infringing Mark, a

17  brand manager for the prospective client raised the re-brand and inquired about what

18  was going on, expressing confusion over the similarity of the marks.  Multiply's

19  team had to, yet again, quell any confusion and clarify that the X Mark is Multiply's

20  trademarked logo but that, yes, X (formerly Twitter) had simply co-opted it without

21  permission and with impunity.

22      **G.**    **The Damage Inflicted by X (Formerly Twitter)**

23      86.    Multiply's success hinges on instilling confidence in its prospective

24  and existing clients that Multiply is a prestigious, influential, accomplished, and

25  innovative company.  In the Summer of 2023, X (formerly Twitter) stole the most

26  identifying feature of Multiply – its X Mark.  Doing so not only irreparably

27  damaged Multiply's identity as "X" but also its ability to present itself as a

28  prestigious, influential, accomplished, and innovative competitor to X (formerly

Twitter), among other social media and public relations agencies.

87.     The similarities between the Infringing Mark and the X Mark, and X (formerly Twitter)'s use of its Infringing Mark in the same industry and with the same prospective and existing clients as Multiply, will continue to cause confusion because those clients will mistakenly believe that X (formerly Twitter) and its services are connected with, sponsored by, affiliated with, or related to Multiply, or that Multiply and its services are connected with, sponsored by, affiliated with or related to X (formerly Twitter).

88.     Multiply has had to take proactive steps to mitigate confusion among its existing clients. For example, Multiply has been forced to alter its promotional and marketing strategies in attempts to avoid that confusion, further damaging and devaluing Multiply's brand.  Multiply has ceased referring to itself as "X" and its employees as "Xers."

89.     However, Multiply could not contain all the damage inflicted by X (formerly Twitter)'s decision to rebrand to the Infringing Mark.  Interest from prospective clients significantly declined following the rebranding.  In the second half of 2023, just after X (formerly Twitter) took over Multiply's trademarked identity, traffic to Multiply's website dropped off dramatically and sales declined nearly 25%.  Multiply expects it will lose revenue in the coming months and years from the sales of its services in connection with the X Mark.

90.     It is, and will continue to be, confusing to any member of the buying public when one company called  ✖  has to advertise its services for marketing campaigns on another company called  𝕏.

91.     In late 2023, dozens if not hundreds of advertisers suspended all advertising campaigns on X (formerly Twitter).  It is reported that those advertisers did not want any association with the brand X (formerly Twitter) due to the conduct of the new ownership, which was entirely unrelated to Multiply.  As one CNN report observed, many "prominent brands halted their advertising on X" due to

perceived reputational risks associated with the new ownership. *See* "Major
advertisers flee X, deepening crisis at Elon Musk's social media site" (Nov. 18,
2023), *https://www.cnn.com/2023/11/17/tech/lionsgate-suspends-advertising-x-
musk/index.html* (last visited May 4, 2024); *see also* CBS News, "Elon Musk's X,
formerly Twitter, sues Media Matters as advertisers flee over report of ads
appearing next to neo-Nazi posts" (Nov. 20, 2023),
*https://www.cbsnews.com/news/elon-musk-x-twitter-sues-media-matters-ads-hate-
groups/* (last visited May 4, 2024).

92. Multiply risks association with that negative publicity and associated
decline in advertising revenue and damage to its brand. The resulting damage to
Multiply is unavoidable. Some advertisers will confuse Multiply's X Mark with the
Infringing Mark and avoid doing business with Multiply. Even advertisers who are
not confused will be hesitant to have their brands associated with an X Mark that
could negatively confuse the buying public because it resembles the Infringing Mark
and its concomitant reputational risks.

93. On the other hand, X (formerly Twitter) hired a new CEO last year who
has focused a substantial amount of time trying to win back advertisers. This
increases the likelihood that clients who continue to wish to pay for social media
campaigns to run on X (formerly Twitter)'s platform will be confused about which
X to choose.

94. On information and belief, X (formerly Twitter) intentionally selected
its Infringing Mark at a time when it knew, or with reasonable diligence should have
known, about Multiply's pre-existing X Mark.

95. On information and belief, X (formerly Twitter) has profited from
unauthorized use of the X Mark. X (formerly Twitter) has never paid a royalty or
any other remuneration to Multiply for the use of the X Mark.

96. Multiply has lost and will continue to lose the royalties that X
(formerly Twitter) would have been paying had it obtained a license to use the X

1  Mark from Multiply instead of infringing upon the X Mark.

2       97.    X (formerly Twitter)'s conduct is the result of willful and wanton

3  disregard of Multiply's established and superior rights.  X (formerly Twitter)

4  adopted and used, and continues to use, its Infringing Mark without authorization

5  and with knowledge of Multiply's superior rights.  Multiply has suffered, and will

6  continue to suffer, irreparable injury as a result of X (formerly Twitter)'s unlawful

7  action and has no adequate remedy at law.

8                       **FIRST CLAIM FOR RELIEF**

9      **(Trademark Infringement Pursuant to 15 U.S.C. § 1114)**

10       98.    Multiply re-alleges and incorporates herein by reference each and every

11  allegation set forth above.

12       99.    Multiply owns a valid registration issued by the USPTO for its

13  trademark, the X Mark, in a variety of uses and categories, including for social

14  media advertising and marketing.

15       100.   The X Mark is a valid, protectable mark that Multiply uses in

16  commerce.

17       101.   Defendant's use of its Infringing Mark infringes on the X Mark because

18  it is likely to cause confusion, or to cause mistake, or to deceive.  The parties' marks

19  are substantially similar and used in connection with some of the same category of

20  goods and services.

21       102.   Multiply has not consented to Defendant's use of the Infringing Mark.

22       103.   Defendant's unauthorized use of the Infringing Mark constitutes

23  trademark infringement in violation of 15 U.S.C. § 1114.

24       104.   As a proximate result of the unfair advantage accruing to Defendant

25  from using a confusingly similar mark, Defendant has made substantial sales and

26  profits in amounts to be established according to proof.

27       105.   As a proximate result of the unfair advantage accruing to Defendant

28  from using a confusingly similar mark, Multiply has suffered damages in amounts to

1   be established according to proof.

2       106.   Unless restrained by the Court, Defendant will continue to infringe the

3   X Mark.  Pecuniary compensation will not afford Multiply adequate relief for the

4   damage to its trademark and brand.  In the absence of injunctive relief, consumers

5   are likely to continue to be confused, mistaken or deceived.

6       107.   Because of Defendant's willful acts of trademark infringement, this is

7   an exceptional case making Multiply eligible for an award of attorneys' fees

8   pursuant to 15 U.S.C. § 1117(a).

9                        **SECOND CLAIM FOR RELIEF**

10          **(False Designation of Origin Pursuant to 15 U.S.C. § 1125(A))**

11      108.   Multiply re-alleges and incorporates herein by reference each and every

12  allegation set forth above.

13      109.   Defendant has used the Infringing Mark in a way that is likely to cause

14  confusion and/or mistake among the same prospective and existing clients sought by

15  Multiply by falsely suggesting that Defendant and its services are connected with,

16  sponsored by, affiliated with, or related to Multiply, or that Multiply and its services

17  are connected with, sponsored by, affiliated with or related to Defendant.

18      110.   Defendant's unauthorized use of the Infringing Mark constitutes a false

19  designation of origin in violation of 15 U.S.C. § 1125(a).

20      111.   As a proximate result of the unfair advantage accruing to Defendant

21  from using a confusingly similar mark, Defendant has made substantial sales and

22  profits in amounts to be established according to proof.

23      112.   As a proximate result of the unfair advantage accruing to Defendant

24  from using a confusingly similar mark, Multiply has suffered damages in amounts to

25  be established according to proof.

26      113.   Unless restrained by the Court, Defendant will continue to infringe the

27  X Mark.  Pecuniary compensation will not afford Multiply adequate relief for the

28  damage to its trademark and brand.  In the absence of injunctive relief, prospective

and existing clients are likely to continue to be confused, mistaken or deceived as to the true source, origin, sponsorship, endorsement and affiliation of the parties' marks.

114.   Because of Defendant's willful acts of trademark infringement, this is an exceptional case making Multiply eligible for an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## THIRD CLAIM FOR RELIEF
### (Common Law Unfair Competition)

115.   Multiply re-alleges and incorporates herein by reference each and every allegation set forth above.

116.   Defendant's unauthorized use of the Infringing Mark is likely to cause consumer confusion as to the source, origin, sponsorship, and association of Defendant's offerings/services.

117.   Multiply will be irreparably harmed by Defendant's actions unless Defendant is enjoined by this Court.

118.   Multiply has no adequate remedy at law.

119.   Multiply is entitled to recover damages and/or Defendant's profits in an amount to be determined at trial.

120.   Multiply is informed and believes, and thereon alleges, that the Defendant committed the foregoing acts with the intention of depriving Multiply of its legal rights, with oppression, fraud, and/or malice, and in conscious disregard of Multiply's rights.  Multiply is, therefore, entitled to an award of exemplary and punitive damages, according to proof.

## FOURTH CLAIM FOR RELIEF
### (Violation Of California's Unfair Competition Law [Bus. & Prof. Code § § 17200, *et seq.*])

121.   Multiply re-alleges and incorporates by reference the above allegations.

122.   Defendant has committed acts of unfair competition, as defined by

California Business and Professions Code § 17200, by infringing upon Multiply's trademark.

123.   Multiply has suffered injury as a direct and proximate result of Defendant's unfair and unlawful conduct because, upon information and belief, Defendant's unlawful acts have caused customer confusion.

124.   Multiply is without an adequate remedy at law.  Defendant's unlawful conduct is ongoing and will continue absent injunctive relief causing continued injury to Multiply.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

1.   For preliminary and permanent injunctions enjoining and restraining Defendant, its agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with, Defendant, from:

      a.   using the Infringing Mark, or any other mark that is confusingly similar to Multiply's X Mark;

      b.   doing any act or thing likely to confuse or to deceive consumers into believing that there is some connection, affiliation or sponsorship between Defendant and Multiply;

2.   For an order requiring Defendant, pursuant to 15 U.S.C. § 1118, to deliver up for destruction all packaging, advertising and promotional materials in the Defendant's possession, bearing the Infringing Mark;

3.   For an accounting of all profits obtained by Defendant as a result of its infringing acts and an order that Defendant hold all such profits in a constructive trust for the benefit of Multiply;

4.   For an award to Multiply of all profits earned by Defendant from its infringing acts in an amount according to proof;

5.   For compensatory damages according to proof;

6.   For damages resulting from Defendant's infringement under the

1 | Lanham Act to be trebled due to Defendant's willfulness in accordance with 15
2 | U.S.C. § 1117(a);

3 |       7.    For exemplary, and/or punitive damages;

4 |       8.    For pre-judgment interest on all damages awarded by this Court;

5 |       9.    For reasonable attorney's fees and costs of suit incurred herein; and

6 |       10.    For such other and further relief as the Court deems just and proper.

8 | DATED:  July 22, 2024        ELLIS GEORGE LLP

10 |         By:  *s/Keith J. Wesley*
                Keith J. Wesley

11 |         Attorneys for Plaintiff

12 |         DB COMMUNICATIONS LLC dba MULTIPLY

13 | ROSS LEVITT LLC
   Brandon Levitt
14 | (*pro hac vice* forthcoming)
   1629 K Street NW, Suite 300
15 | Washington, D.C. 20006
   Tel.: (202) 810-3833
16 | brandon@rosslevittllc.com

18 | BERLINER CORCORAN & ROWE LLP
   Jared Butcher
19 | (*pro hac vice* forthcoming)
   1101 17th Street NW, Suite 1100
20 | Washington, D.C. 20036
   Tel.: (202) 293-5555
   jbutcher@bcrlaw.com

21 | 
22 | Attorneys for Plaintiff
   DB COMMUNICATIONS LLC dba MULTIPLY

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands a trial by jury.

3

4  DATED:  July 22, 2024        ELLIS GEORGE LLP

5

6
                               By:____*s/ Keith J. Wesley*_____
7                                        Keith J. Wesley
8                               Attorneys for Plaintiff
                               DB COMMUNICATIONS LLC dba MULTIPLY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2440055

-23-
COMPLAINT